ELEANOR C. ASHLEY & others *vs.* ROBERT L. WINKLEY & another, trustees.

Suffolk.    March 20, 1911. — June 29, 1911.*

Present : KNOWLTON, C. J., MORTON, HAMMOND, BRALEY, & RUGG, JJ.

*Trust,* Accounting by trustee, Trustee's duties as to preservation of trust property, Liability of co-trustee. *Equity Jurisdiction,* For an accounting, Plaintiff must have "clean hands." *Evidence,* Presumptions and burden of proof.

In a suit in equity by a beneficiary under an express trust against the trustee for an accounting, the burden is upon the defendant to show that in the discharge of his duties he has exercised reasonable skill, prudence and judgment.

A suit in equity by the beneficiaries of a real estate trust against the trustee for an accounting was referred to a master, who found the following facts : The trust property consisted of a hotel which for a number of years had been leased to a tenant who, about six years before the commencement of the suit, had become $20,000 in arrears in his rent. About a year later, the tenant being still in arrears about $19,000, the trustee dispossessed him. Shortly thereafter the tenant died insolvent. The trustee then placed a manager in the hotel to run it on behalf of the trust. In doing so, certain furniture which had been used by the tenant was taken possession of by the trustee. A liquor license under which the tenant had operated the hotel had been issued in the name of his wife. Of $60,000 worth of furniture which he had used in the hotel, $56,000 worth had been purchased by him subject to a right of the vendor to resume possession on non-payment of the purchase price, of which the tenant owed $12,000 at the time of his death. The widow of the tenant claimed title to the rest of the furniture, and, " on advice of able and competent counsel," the trustee settled her claim by paying her $4,000. At the hearing before the master the trustee gave no other explanation of his action. *Held,* that upon the findings of the master it did not appear that the settlement with the tenant's widow was so injudicious or unwarranted that the trustee should be charged personally with the amount he paid her.

A suit in equity by the beneficiaries of a real estate trust against the trustee for an accounting was referred to a master, who found the following facts : The trust property consisted of a hotel which about six years before the commencement of the suit was held by a tenant who was $19,000 in arrears in his rent. Friends of the tenant then took charge of the hotel and ran it with the tenant as manager until he died, hopelessly insolvent, when the trustee placed a manager in charge and ran it for the trust. In doing so, he took possession of certain supplies which belonged to the tenant's friends. The friends owed the trust for rent $3,933, and, upon their making claim upon the trustee for the supplies of which he had taken possession, he settled with them by paying to them $2,810. The entry in the trustee's cash book was " Supplies and equity all that " the

* The opinion in this case was withdrawn on an application for a rehearing. This was denied on September 5, 1911, when the opinion was returned to the Reporter.

tenant's friends "owned, $2,810." What the value of the supplies was did not appear. The only explanation given by the trustee of his action was that he acted in accordance with the advice of able and competent counsel. *Held,* that upon the findings of the master it did not appear that the settlement with the tenant's friends was so injudicious or unwarranted that the trustee should be charged personally with the amount he paid them.

A suit in equity in the Superior Court by the beneficiaries of a real estate trust against two, who were the trustees, for an accounting was referred to a master who found the following facts: The trust property consisted of a hotel in Boston worth about $500,000. Under the trust instrument shares were issued to the beneficiaries to represent their interests in the trust. The owner of a majority of the shares, one P, who was not a party to the suit, had procured the appointment as one of the two trustees of his confidential secretary and bookkeeper, who did not appear to have been possessed of any knowledge as to the duties of a trustee or to have had any experience in the management of real estate, and who " must have regarded this service only as one of the many which he was employed to render to " P " and for which he looked to " P " for compensation." He became the managing trustee. The other trustee was old and partially blind. Neither trustee had any other interest in the trust than as trustee. Five years before the commencement of the suit the trustees had dispossessed a tenant who had been in possession of the hotel for many years and who was $19,000 in arrears in rent, and, being unable to find a new tenant, had placed a manager in charge to run the hotel for the trust. In doing so they had taken possession of the furniture which had been used by the tenant. All but $4,000 worth of this the tenant had procured at a price of $56,000, subject to a right of the vendor to resume possession on non-payment of the purchase price, on which he had paid $44,000. For failure of the tenant to pay the entire purchase price the vendor then took possession of the furniture and claimed title to it. The managing trustee was absent from the Commonwealth on P's business and the master found that " The furniture matter was, as might have been expected, handled by P." The remaining $4,000 worth of furniture was claimed by the tenant's widow, and, under advice of competent counsel, the trustees paid her that amount. They then conveyed that furniture to P for $5,000. He purchased the other furniture from the vendor for $12,000. At a later date, when the trustees had found a tenant, P sold the furniture to the tenant for $9,000 and made a claim upon the trustees for the $8,000 actual loss on his advances and for $400 a month for thirteen months during which the trustees had used the furniture in the hotel under their own management. The trustees paid the amount demanded, and later signed a paper, antedated to correspond with the date of the transaction and purporting to be a vote by them to make the payment in accordance with a previous oral contract under which the new tenant was procured and " to reimburse " P " for his loss sustained in behalf of the " trust property " in the sale of the furniture, and for the use of the same." The master found that the payment of $8,000 to P to reimburse him for cash lost in the transaction was warranted, but that the payment of $400 a month for the use of the furniture was unwarranted, five per cent on the amount invested being sufficient. The defendants excepted to the master's findings. The judge of the Superior Court overruled the exceptions, and the defendants appealed. *Held,* that the trustees should be charged in accordance with the master's report.

Ignorance on the part of a trustee of an express trust as to the scope of his duties or as to the legal requirements of his office does not free him from liability for

losses sustained by the trust by reason of a breach of such duties on his part or a failure to fulfil the requirements of his office.

A suit in equity by the beneficiaries of a real estate trust against two, who were the trustees, for an accounting was referred to a master who found the following facts: The trust property consisted of a hotel in Boston worth about $500,000. Under the trust instrument shares were issued to the beneficiaries to represent their interests in the trust. The owner of a majority of the shares, one P, who was not a party to the suit, had procured the appointment as one of the two trustees of his confidential secretary and bookkeeper, who did not appear to have been possessed of any knowledge as to the duties of a trustee or to have had any experience in the management of real estate, and who "must have regarded this service only as one of the many which he was employed to render to" P "and for which he looked to" P "for compensation." He became the managing trustee. The other trustee was old and partially blind. Neither trustee had any other interest in the trust than as trustee. The trust property was subject to a first mortgage for $250,000 and a second mortgage for $50,000. The second mortgage had been held by a former trustee. It came due about the time that P procured the election as trustee of his nominee. The managing trustee "did not realize that" the mortgage "ought to be paid," and no effort was made to renew it. The original mortgagee having died, the mortgage had been assigned by his son, who had succeeded to the mortgage title, to a stranger to the trust without the knowledge of the trustees and the assignment was not recorded for some years. After it had been overdue for about five years a financial panic occurred and the assignee demanded payment. Both the trustees and P and the original mortgagee's son sought funds with which to save the property from a sale. The mortgagee's son found one who offered to lend the necessary amount although he demanded a bonus of $5,000 and twelve per cent interest per year. This offer was communicated to both trustees. The managing trustee and P and their personal counsel considered what should be done without consulting with the other trustee and, without informing him, decided to attend the sale, to bid the property up to about $80,000 above the first mortgage, and then to let it go. They did so and the property was sold for $77,250 above the first mortgage. In the transaction, the managing trustee not only "kept" his co-trustee "in the dark, but ... actually misled" him. The property was worth $100,000 more than it was sold for. *Held*, that both trustees were personally chargeable for the $100,000 thus lost.

Although one of two trustees of a real estate trust is not responsible for acts or misconduct of a co-trustee, who is the managing trustee, in which he has not joined or to which he does not consent or which he has not aided or made possible by his own neglect, he is chargeable for losses resulting from his failure to inform himself of business transactions involved in the execution of the trust even if he is deceived and purposely kept uninformed by the managing trustee, because he cannot properly discharge his duty by surrendering the substantial or entire control of the trust to the managing trustee, and this is especially true where with the co-trustee's knowledge the managing trustee is entirely under the control of the owner of a majority of the interest of the beneficiaries and is used by such owner to further his own ends at the expense of the trust.

In a suit in equity by several of the beneficiaries of a real estate trust against the trustees for an accounting, in which the defendants were held to be liable for a loss sustained by the trust by reason of a sale during a financial panic of the property of the trust in foreclosure of a second mortgage which should not have been allowed by the trustees to become overdue, it appeared that about ten years

before the sale the mortgage had been held by a former trustee of the trust and that shortly thereafter the mortgagee had died and the mortgage had become overdue. Both trustees thought that the mortgage continued to be held by one of two sons of the original mortgagor, who had succeeded to his father's title, and checks to pay interest had been sent to the son. About five years before the foreclosure, the mortgage had been assigned by the son to a stranger to the trust. The trustees had not been informed of the assignment and it was not recorded for some years. One of the plaintiffs was a corporation, shares in which were owned or controlled equally by the two sons of the original mortgagor. *Held,* that the corporation was not estopped from sharing in the distribution of the amount recovered in the suit because of the action of the owner of one half of the shares of its capital stock.

In a suit by several beneficiaries of a real estate trust against the trustees for an accounting, it appeared that shares were issued to the beneficiaries in proportion to their investments therein, and that the trust had suffered losses by reason of neglect and mismanagement on the part of the trustees which were participated in and in the main caused by one P, the owner of two thirds of the shares of the trust. *Held,* that the defendants should pay to each of the plaintiffs such a portion of the loss sustained by the trust as his shares bore to the total of the shares issued; but that the trustees should not be charged with the proportion of the loss represented by shares formerly owned by P.

BILL IN EQUITY, filed in the Superior Court on May 14, 1908, by the beneficiaries under an express trust, called the "Copley Square Hotel Trust," against those who then were trustees thereunder, Robert L. Winkley and Frederic Pope, for an accounting.

The case was referred to Robert D. Weston, Esquire, as master.* In his report he stated, among other facts, that the declaration of trust was dated January 22, 1892; that the trust property included about eleven thousand square feet of land on the corner of Huntington Avenue and Exeter Street in Boston and a hotel building thereon, of a value between $500,000 and $600,000. The original trustees were Frederic Pope, George T. Sheldon and Lewis F. Perry.

When the property was conveyed to the trustees it was subject to a first mortgage for $225,000 and a second mortgage for $75,000. These were discharged and succeeded by a first mort-

---

* The reference to the master was on October 21, 1908. On September 14, 1910, the plaintiffs moved to amend the bill by adding allegations that Albert A. Pope had deceased since the filing of the bill, by including the executors of the will of Albert A. Pope as defendants and by seeking relief against the estate of Albert A. Pope. The motion was denied on September 20, 1910. The plaintiffs did not appeal from the denial of the motion. The master's report was filed on November 12, 1910.

gage to the Provident Institution for Savings for $250,000, and a second mortgage for $50,000 to Sheldon, one of the trustees.

Trust certificates for $200,000, the value placed on the equity, were issued in accordance with the provisions of the trust instrument to various persons. When the trust was first established Frederic Pope held shares to a nominal value of $75,000 or $80,000. These he pledged in the year 1896 to his cousin Albert A. Pope in order to secure a debt and, in 1897, in order to satisfy that and other obligations, he transferred to his cousin all his shares absolutely. Since then Frederic Pope has had no title to any shares. As a result of these transactions, on July 19, 1897, Albert A. Pope held shares to the nominal value of $133,409, or a little over two thirds of the total value of all the shares. This gave him power under the terms of the trust to remove any trustee and to appoint a new trustee in his place, to fill vacancies in the number of the trustees and to terminate, alter or amend the trust.

The next largest shareholder was George T. Sheldon, one of the trustees, who held shares to the nominal value of $52,870. Until the appointment of Winkley as a trustee in July, 1897, Sheldon was the managing trustee. His death occurred a few years thereafter. At the time of his death he owned shares in the trust amounting to $53,340. In 1905 Sheldon's certificate for $52,870 was delivered to the International Trust Company "as general collateral for any liability" of Royal R. Sheldon. Royal R. Sheldon was a son of George T. Sheldon and the executor of his will. Subsequently, on May 27, 1907, the International Trust Company caused this certificate to be transferred into the name of one of its officers, B. Farnham Smith, in whose name it stood at the time of the hearings before the master. On May 31, 1907, Royal R. Sheldon undertook by bill of sale to transfer to the Sheldon Corporation any title which he or the estate of George T. Sheldon owned in such shares. The Sheldon Corporation was formed by Royal R. Sheldon and his brother George H. Sheldon, (the only persons interested in the estate of George T. Sheldon,) to take over and hold the assets of the George T. Sheldon estate. The two brothers owned all the stock of said corporation in equal shares except one other share which was given to a third person in order to enable them to

form the corporation.    The transfer of whatever title the Sheldon estate had in the Copley Square Hotel stock, represented by the three certificates aforesaid, was made to this corporation as part of the general transfer of the assets of the estate.

As to the appointment of Robert L. Winkley as a trustee, the master found that Winkley was the person against whom the plaintiffs have directed their attacks, and that "If Frederic Pope is liable for anything which the trustees have done or failed to do it is only upon technical grounds." Winkley was appointed a trustee and accepted the trust on July 22, 1897. Lewis F. Perry, one of the original trustees, had resigned shortly after the establishment of the trust, leaving a vacancy which it had not been thought worth while to fill until Albert A. Pope acquired a "controlling interest" as above described and wished to appoint Winkley. Winkley was Pope's confidential secretary and, as he himself expressed it, he was appointed "because of the interest acquired in the trust by my employer Colonel Albert A. Pope." George T. Sheldon and Frederic Pope and one other shareholder co-operated with Albert A. Pope in effecting Winkley's appointment. Under a power given by the trust instrument, Winkley was employed by himself and Frederic Pope as agent or manager of the trust estate and to do the work of keeping the records and accounts of the trust, and $300 was fixed as his compensation, which the master characterized as "of course, grossly inadequate in view of the responsibility imposed upon him." The master's finding continues: "He had no pecuniary interest whatever in the property. It is obvious that whatever duties he performed as trustee of the Copley Square Hotel were performed for the most part merely as the agent and servant of Colonel Pope. He must have regarded this service only as one of the many which he was employed to render to the Colonel, and for which he looked to the Colonel for compensation. It was, so to speak, a part of the day's work in an employment which had existed for some years before he was appointed trustee and continued to exist till after the property was sold by the second mortgagee in the early fall of 1907. This relation between Colonel Pope and Winkley goes far to explain many things which happened later.

" However competent Winkley may have been as a confiden-

tial secretary and bookkeeper, it did not appear that he possessed any knowledge as to the duties of a trustee or that he had had any experience in the management of real estate. Frederic Pope, Winkley's co-trustee, had ceased to have any interest in the property. At the time of Winkley's appointment Frederic Pope was about sixty years of age. As late as 1901, he was able as architect to build a hotel in Providence, but soon after that his eyesight failed. He testified that it had been many years since he had been able to read any paper or legal document. Except for this infirmity he appeared to be much more capable of managing a piece of real estate like the Copley Square Hotel than his colleague Winkley. But at the time when difficulties arose, as they did in 1902, his efficiency as a trustee was already greatly impaired by his loss of sight. . . .

"It would be difficult to conceive of two trustees more poorly situated or qualified to handle the property in their charge during the five years extending from October, 1902, to October, 1907, than were Robert L. Winkley and Frederic Pope."

In 1901 one Risteen was a tenant of the property and for the previous five years he had been regular in the payment of rent. On January 1, 1901, there was a balance due from him of $700, which increased until at the end of the year he was in arrears $20,000. On February 1, 1903, he owed the trustees about $19,000. In 1902 the defendant Winkley went to New York on business for Albert A. Pope and lived there for about three years, when he went to Hartford for the same employer and lived there for about two years.

Friends came to Risteen's support and formed or started to form a corporation called the Copley Square Hotel Company to run the hotel with Risteen as manager. Some oral agreement was made with the company to permit it to occupy the hotel and pay rent at the rate of $100 a day. This arrangement continued from February 1 till April 22, 1903, when nominally it was terminated although to all intents and purposes it was terminated earlier by the sickness and death of Risteen, on whom the whole scheme depended, at some time in April, 1903. On March 27, 1903, Frederic Pope had entered for the trustees in order to terminate the Risteen lease. If the Copley Square Hotel Company was really responsible for the rent at the rate of $100 a day

from February 1 to April 22, inclusive, (81 days,) it owed the trustees $8,100. With this amount the company was charged on the trustees' books. When its occupancy terminated this amount had been reduced by payments so that $3,933.05 was the balance due on the account. The trustees took possession of certain furniture which Risteen formerly had used and of certain supplies belonging to the company, which were in the hotel when the company went out, and which were the subject of settlements made later, of which the plaintiffs complained, and which are referred to in the opinion as the subject of the defendants' first, second and third exceptions to the master's report.

The trustees being without a tenant after April 22, 1903, tried in vain for several weeks to find one. In May they put a man named Sturgis into the hotel to run it as their manager until a tenant could be found.

The report continues : " The furniture in the hotel had for the most part been bought by Risteen of John H. Pray and Sons Company. Some of it was then or later claimed by Mrs. Risteen. Whether the title to the furniture which Risteen had bought of Pray had actually passed to Risteen and a mortgage had been given back to secure payment, or whether it had been leased to Risteen under a contract which provided that the title should not pass until the purchase price had been paid, did not appear. However this may have been John H. Pray and Sons Company had a right to foreclose or take possession of the greater part of the furniture in the house.

" The hotel liquor license stood in the name of Mrs. Risteen. What arrangement, if any, was made with her by the trustees as to the use of the license did not appear. The trustees paid the usual license fee ($1,000) on April 30, 1903. Nothing was done about a transfer of the license until the following spring. Whether the trustees then obtained a transfer of Mrs. Risteen's license or got a new one did not appear. . . .

" The furniture matter was, as might have been expected, handled by Albert A. Pope. Pray and Sons wanted their money and arranged with him to have him pay what was still due them from Risteen. Pray and Sons foreclosed or took possession of the furniture. Pope paid them $12,035.07 and took title from them

to all the furniture which Risteen had bought of them. This payment was made on June 29, 1903. Mrs. Risteen's claim that she was the owner of part of the furniture in the hotel, if it had been made at this time, was left in abeyance. Her claim was not settled until the following January (1904). At some time between Risteen's death and January, 1904, such a claim was made. An inventory of all the furniture in the hotel was taken. It was also appraised. Outside of the furniture which Albert A. Pope bought of Pray other furniture was found to an appraised value of over $4,000. This Mrs. Risteen said belonged to her personally. How Mrs. Risteen acquired her title did not appear. All the defendants proved was that she claimed to be the owner, that they employed able and competent counsel to represent them in the person of William F. Garcelon, Esquire (who was recommended for engagement as attorney by the defendant Frederic Pope, and was recommended to Frederic Pope by Charles H. Tyler, Esquire, whom Mr. Pope had originally asked to undertake the matter), and that he advised them to make the settlement with her which they finally made. The plaintiffs contended that for aught that appeared the property had belonged to Risteen, whose estate owed the trust over $19,000, that the trustees really knew nothing to the contrary and that the settlement should not have been made. At any rate the plaintiffs said that it had not been sufficiently justified or explained. Nothing was ever collected by the trustees from Risteen's estate, which was undoubtedly insolvent. When it came to the actual settlement with Mrs. Risteen two bills of sale of 'all right, title and interest' in 'the furniture, fixtures, housekeeping goods and personal property' in the hotel were given; one by her personally and the other by her as executrix of her husband's will, and the check for the purchase money ($4,189.83) was paid by a check to her order as executrix. The entry in the cash book was 'Furniture and all owned by Susan M. Risteen Ex.' Winkley testified that the trustees were advised by counsel that the property transferred belonged to Mrs. Risteen and that they took a bill of sale from her as executrix merely as a precautionary measure. Both bills of sale stated the consideration to be one dollar and other valuable considerations. The payment was made January 22, 1904. In this connection

it perhaps ought to be stated that Risteen had paid Pray and Sons between September 3, 1891, and October 31, 1902, on account of the furniture which Albert A. Pope had bought of them $44,667.92, and that the $12,035.07 which Albert A. Pope paid Pray and Sons was the balance remaining due on the account. It may be conjectured that some claim to this furniture was advanced on behalf of Risteen's estate and figured in the settlement made in January with Mrs. Risteen. But nothing of this kind was suggested in the evidence of the defendants. In the settlement with Mrs. Risteen, Albert A. Pope again came to the assistance of the trustees. On the day the money was paid to Mrs. Risteen (January 22, 1904) he paid the trustees $5,000, out of which they made the payment and in consideration for which the trustees transferred to him whatever title they acquired from Mrs. Risteen.

" As a result of these transactions Colonel Pope became the owner of all the furniture, fixtures and housekeeping goods in the hotel and had paid therefor on June 29, 1903, $12,035.07, and on January 22, 1904, $5,000, a total of $17,035.07. It was later (August, 1904) all sold to the new tenant of the hotel, Amos H. Whipple, for about $9,000.

" Simultaneously with the settlement made with Mrs. Risteen personally and as executrix another settlement was made by the trustees. They paid the Copley Square Hotel Company $2,810.17. In the cash book the entry reads ' Supplies and Equity all that Copley Co. owned $2,810.17.' This was said to represent the stock of wines, liquors, cigars and provisions left in the hotel by the company when the trustees took possession in the spring of 1903. What their value was did not appear. Why the trustees were paying this money to the company when according to the trustees' books the company owed them $3,933.05, was not explained. The only explanation or justification offered by the trustees was that they paid the money under the advice of counsel whom they had employed to investigate the matter and advise them. Their counsel was Mr. Garcelon. He was not called as a witness.

" In the meantime the hotel was still being run by the trustees with Sturgis in charge as their manager. The hotel was not profitable and no dividends were being earned for the share-

holders. The trustees had never regarded the Sturgis management as anything but a temporary arrangement. From the beginning they were trying to find a new tenant."

In August, 1904, the hotel was leased to Amos H. Whipple. In order to secure the tenant, or at least to facilitate the negotiations, Albert A. Pope sold him the furniture for $9,000, thereby sustaining a cash loss of $8,000 on the whole transaction. Albert A. Pope then " decided to charge $400 a month for the use of the furniture,". and in accordance with his wishes the trustees gave him a note dated September 30, 1904, for $13,000, payable one year after date, covering the $8,000 lost through the sale to Whipple and $5,000 for rental of the furniture. This note the trustees ultimately paid with interest at the rate of five per cent. At some time after October 7, 1904, acting under advice of Benjamin D. Hyde, Esquire, the trustees signed *nunc pro tunc* a paper dated September 30, 1904, the day the note had been given, stating that " at a regularly called meeting of the Trustees," it was voted in substance that, " Whereas Colonel Albert A. Pope " had made a verbal agreement with the trustees to sell the furniture to Whipple at a loss provided they would reimburse him for that loss and in addition would pay him " a reasonable sum for the use of said furniture during the time that we, as Trustees, were operating this hotel property," it was voted : " That, We, the trustees of the Copley Square Hotel Trust, do hereby give to said Albert A. Pope trustees' notes to the amount of $13,000 to reimburse him for his loss sustained in behalf of the Copley Square Hotel property in the sale of his furniture therein and for the use of the same ; hereby carrying out the verbal contract we made with said Pope at the time the lease was executed with Amos Whipple." The master finds : " This posthumous record of an imaginary meeting was signed by both trustees. I find that it was reasonable and proper for the trustees to reimburse Colonel Pope for the difference between the price that he had paid and the price that he had sold. I also find that he was entitled to a reasonable rate of interest on the two advances which he had made on behalf of the trust. But I find and rule that it was not proper to pay him $400 a month for the use of the furniture and that five per cent per annum, the rate which he charged on his note would have been reasonable interest for the trustees

to allow him on his advances.  Colonel Pope's relation to the trust and to Winkley was such that he would not have been justified in demanding and the trustees were not justified in paying a larger rate of interest.  Allowing the loss measured by the difference between the purchase and selling price, $8,000, and adding thereto interest on his two payments from the dates when they were made to September 30, 1904, . . . I find that on account of this transaction the trustees are chargeable with $4,000 and with interest thereon from September 30, 1905."

The second mortgage of $50,000 to George T. Sheldon, previously referred to, came due at about the time that the defendant Winkley became a trustee.  Neither he nor the defendant Pope did anything about it for several years.  The master's report states : " Winkley, the managing trustee, did not realize that the mortgage ought to be either paid or renewed or extended so that the mortgage debt would be payable at a definite time.  To be sure, both trustees supposed that the note was in the hands of Royal R. Sheldon who held it either personally or as his father's representative.  He likewise held a large interest in the shares of the trust and was friendly to the trustees.  On the other hand, Sheldon was under no obligation not to assign the note and mortgage and for aught the trustees knew might do so at any time.  He had in fact assigned it to one McQuesten on July 2, 1902, without informing the trustees that he had done so.  This assignment was not recorded until August, 1906, but the recording was of no significance because the trustees had no occasion to examine the title and had no actual notice.  Notwithstanding the assignment, Royal R. Sheldon received the trustees' checks for the interest and turned them over to McQuesten. The last interest was paid to Sheldon on April 12, 1907.  Shortly before this McQuesten had asked Winkley to pay the interest to him as assignee of the mortgage, but Winkley disregarded this request and wrote McQuesten that the mortgage stood in Sheldon's name.  McQuesten then wrote to Winkley again, April 11, 1907, telling Winkley that he was mistaken and giving him the date of the assignment and a reference to the book and page in the registry where he could find the record.  Sheldon turned over the check which he had received to McQuesten and Winkley's mistake as to who held the mortgage did no

harm. The information that the mortgage was in the hands of McQuesten caused Winkley no uneasiness. He made no effort to pay, renew or extend it. He did not even inform his co-trustee of the assignment. He in fact attached no importance to the matter. It never occurred to him that if money became scarce and hard to borrow McQuesten would probably demand the payment of the mortgage note and that at the same time it would probably be very difficult for the trustees to borrow $50,000 on a second mortgage of a rather unsuccessful hotel already subject to a first mortgage of $250,000.

"The panic of 1907 began and just what Winkley ought to have anticipated and guarded against happened. McQuesten demanded the payment of the principal long since overdue and behind his demand were his right to foreclose and his power of sale. . . .

"In this respect I find that Winkley failed to exercise the care and prudence which the law demands of a trustee in his position. His ignorance does not excuse him. Frederic Pope, although he was not the active trustee and although he probably gave no thought to the second mortgage, knew that it was over-due, knew that Sheldon might assign it and that payment might be demanded at any time. He testified that he supposed Winkley had attended to it, but if he had thought about it at all he would have realized that Winkley could not have discharged or extended it without the execution of papers by his co-trustee. So far as this second mortgage is concerned, I find that the defendant Pope did not exercise such supervision as the law demands of a trustee, and is responsible with Winkley for the loss which the beneficiaries sustained because of Winkley's failure to take proper care of the second mortgage."

The mortgagee caused the property to be advertised for sale at auction, the sale to take place on August 17, 1907, and a deposit of $1,000 to be required of the purchaser. Winkley caused a straw bidder to attend the sale, bid in the property and pay the deposit, hoping that before the purchaser was called upon to complete his purchase, or before the property could be adver-tised and sold again, the trustees might find some one who would lend the money. No lender was found, however, within the time fixed for the completion of the sale and the property again was

advertised to be sold.   The report continues : " This second sale was to take place on September 19, and this time a deposit of $5,000 was required.   The trustees tried to raise money in every.way they could think of.   Under ordinary circumstances Albert A. Pope might have been expected to save the property. Although for about two years he had been in ill health and unable to give much attention to business, he had for many years been a man of large financial resources.   Now he was financially embarrassed.   About this time his company went into the hands of a receiver and he had to call a meeting of his personal creditors and ask for an extension.   But a number of his friends were approached on behalf of the trust. . . . Agents were also employed to see possible lenders.   But no one could be found. Frederic Pope was also interviewing or approaching in one way or another every possible lender that he knew, but was no more successful than Winkley and the Colonel.

" Sheldon was also engaged in the same pursuit and was the only man who found a person who would lend the money on any terms.   This was Mr. Rollin H. Allen who told Sheldon in a conversation a day or two before the second sale that he would lend the amount required, up to $50,000, and would pay the $5,000 to be deposited at the sale.   For this he demanded a six months' mortgage which he said he would be willing to renew for a further six months if the trustees desired such renewal, a bonus of $5,000 to be paid in cash or added to the amount of the mortgage note and interest at the rate of one per cent a month or twelve per cent per annum.   I find that Allen was able and willing to carry out his agreement with Sheldon.   Sheldon reported this offer of Allen's to Frederic Pope and to Winkley the day before the sale."

On the morning of the sale there was a meeting at the office of M. F. Dickinson, Esquire.   Mr. Dickinson, who had been retained after the first sale, was acting as counsel for Albert A. Pope and Winkley.   The meeting was held in Mr. Dickinson's private office.   There were present Albert A. Pope, Winkley, Mr. Dickinson and his associate Mr. Williston.   Frederic Pope and Royal R. Sheldon were on hand but were not admitted to the inner office and had no part in the conference which took place there.

During the discussion in the inner office, the fact that Sheldon had been negotiating with Allen for a loan was mentioned, and Mr. Dickinson sent Winkley out to talk with Sheldon and find out whether Allen had made any definite offer. Winkley went out and talked with Sheldon and Pope. What was said in this conversation was in dispute, Sheldon and Frederic Pope testifying in substance that Winkley was told that Allen was ready to lend the money and on what terms, and Winkley testifying that Sheldon said that he had no definite proposition. At any rate Winkley returned to the inner office and reported that Sheldon had nothing definite from Allen and Mr. Dickinson remarked "I thought so," and it then was decided to bid the property up to about $80,000 above the first mortgage and let it go to any purchaser who would bid that amount. This conclusion reached in the inner office was not communicated either to Sheldon or to Frederic Pope. They both went away together thinking that some plan had been devised for preserving the property, and that it was to be bid in by the trustees or in their interest.

The report continues: " Mr. Dickinson took charge of matters at the sale for Colonel Pope. Finally a bid was made for Amos H. Whipple of $77,250 above the first mortgage. The bidding had been going slowly and Mr. Dickinson was afraid that if he bid more he would get the property and $4,200, advanced by Albert A. Pope toward an amount which might be required as a deposit, would be in jeopardy. Their purpose had been substantially accomplished and Whipple secured the hotel for $327,250 subject, of course, to the first mortgage.

"I find that in ordinary times the hotel was worth for purposes of sale $100,000 more than the price which it brought at this forced auction sale made in the midst of the panic of 1907. It is obvious now, and I think must have been obvious then, that it would have been much better business judgment to have paid Allen his $5,000 bonus and his twelve per cent interest than to let the equity of the shareholders be wiped out as it was. If Winkley had been acting as an independent and responsible trustee doing all in his power to protect his beneficiaries he would at least have seen Allen himself. Allen was in his office not five minutes' walk from Mr. Dickinson's office. The only explanation

for his conduct appears to be that he found that Colonel Pope was willing to let the property go at or about the figure determined on in the conference. If Colonel Pope was satisfied Winkley was satisfied. As to the report which he made to the inner council of the conversation which he had with Sheldon, I find that it was honestly made. He probably thought that a mere oral proposition was not one on which they could act. He was ignorant about such matters. Things seemed satisfactory to Colonel Pope without more and the confidential secretary was content to let Colonel Pope and his counsel act as they saw fit. Forceful initiative was not characteristic of the man.

"I find that in not pursuing Allen and availing himself as trustee of the means of saving the property which Allen stood ready to supply, he failed in his duty as trustee.

"So far as this part of the business is concerned I cannot see how any blame can be attached to Frederic Pope. He was not only kept in the dark but he was actually misled by his co-trustee. Even when it was known that Whipple had bid in the property Frederic Pope and Sheldon supposed for some days that it had been bought in for the trustees under some arrangement made by Mr. Dickinson with Whipple. They could not believe that Allen's offer had been rejected by the conferees unless they had devised some other plan for preserving the interest of the shareholders.

"As to this loss of $100,000, caused by the foreclosure sale, I find that Colonel Pope assented to and virtually directed the sale. Winkley was a mere agent and tool of Colonel Pope throughout the whole affair. The trustees should not be charged with the proportion of the loss represented by Colonel Pope's share."

The defendants filed the following exceptions to the master's report:

"1. To the refusal of the master to find or rule that the defendants acted with reasonable care and discretion in making the settlement that they did, as shown by the master's report, with Mrs. Risteen.

"2. To the refusal of the master to find or rule that the defendants acted with reasonable care and discretion in making the settlement that they did, as shown by the master's report,

with Colonel Albert A. Pope, in regard to the furniture of the Copley Square Hotel.

" 3. To the refusal of the master to find or rule that the defendants acted with reasonable care and discretion in making the settlement that they did, as shown by the master's report, with the Copley Square Hotel Company.

" 4. To the refusal of the master to find or rule that the defendants acted with reasonable care and discretion in allowing the Copley Square Hotel to be sold at auction, as it was sold, as appears by the master's report.

" 5. To the refusal of the master to find or rule that if the defendants in permitting the Copley Square Hotel to be sold at auction, acted under the direction of the owners or owner of more than two thirds in value of the shares of the Copley Square Hotel Trust, the defendants are under no liability.

" 6. To the refusal of the master to find or rule that on all the facts the defendants have committed no breach of legal duty."

The case was heard by *Hitchcock*, J., who sustained the defendants' first three exceptions and overruled the last three; and a final decree was entered which in all other respects was in accordance with the master's report. Both the plaintiffs and the defendants appealed.

*G. F. Ordway*, for the plaintiffs.

*S. Williston*, (*M. F. Dickinson & C. Dickinson* with him,) for the defendants.

BRALEY, J. The defendants are trustees under an express trust, and in accounting for their administration of the property which they admit that they have received, the burden is on them to show that in the discharge of their duties they have exercised reasonable skill, prudence and judgment. *Andrews* v. *Tuttle-Smith Co.* 191 Mass. 461. *Pine* v. *White*, 175 Mass. 585. *Little* v. *Phipps*, 208 Mass. 331. If we examine the allegations of the bill, they are charged with having failed to protect the property from foreclosure of a second mortgage whereby the equity of redemption was lost, and generally that they grossly neglected their duties, entailing great pecuniary loss to the plaintiffs in common with other beneficiaries and shareholders. But in the report of the master to whom the case was referred, the transactions which the plaintiffs contended were imprudent

and unjustifiable are specifically stated and reviewed. The trust estate when conveyed consisted of the Copley Square Hotel, with the appurtenant land, upon which were mortgages for $300,000. The equity of redemption, valued and capitalized at the nominal sum of $200,000, was divided into shares which if possible were not to be less than $100 each, for which certificates were issued in accordance with the provisions of the declaration or instrument of trust. By the death of one trustee and the resignation of another, only the defendant Frederic Pope of the original trustees remained, and at the request of Albert A. Pope, who had become the owner of two thirds of the shares, the defendant Winkley, with the consent of some of the other principal shareholders, was appointed to one of the vacancies, while the other vacancy remained unfilled. It was during the incumbency of Winkley that the transactions took place on which the plaintiffs rely as proof of a flagrant mismanagement of the estate. The evidence is not reported, and the master's findings as to Winkley's personal relations to Albert A. Pope, and the reasons for his appointment, and Pope's control of Winkley, and through Winkley of the management of the trust are not only important, but should not be reversed unless clearly wrong. It is only when these relations are understood, that the unfortunate conduct of the trustees becomes intelligible. The report states, that this defendant was his confidential secretary and bookkeeper and became trustee because of the large interest which his employer had acquired while the defendant Frederic Pope was the cousin of Albert A. Pope, to whom he was beholden for financial assistance at various times. The master concludes, that in administrative capacity the trustees, and especially Winkley, were not well qualified to administer the trust, and that his double employment " goes far to explain many things which happened later." It appears that from Winkley's accession to the day of the foreclosure the influence of Albert A. Pope was dominant in all important business affairs with which the trustees dealt.

The very full statements relating to the defendants' first and third exceptions need not be reviewed. The master reports the facts, but does not decide the question of liability. If when the defendants took possession of the premises for the purpose of

terminating the lease of their tenant one Risteen, or the occupancy of his successor, the Copley Square Hotel Company, and while seeking for a new tenant carried on the business, they also took and used supplies which were in the hotel, and furniture belonging to the tenant's wife, they were accountable to the owners for their value. The settlements arranged with them upon the advice of competent counsel do not appear to have been so injudicious and unwarranted that the defendants should be personally charged with the amounts paid. *Pine* v. *White*, *supra.*

But the payment to Albert A. Pope of $5,200 for thirteen months' use of the furniture, stands upon a different footing. If under the circumstances it is assumed, that the trustees had implied authority to buy the furniture, fixtures and household supplies which were in the hotel, but permitted or requested Pope to act for the sole benefit of the trust as apparently he did, the master finds, that he had been fully reimbursed by the trustees for the loss sustained when he sold the property to their new lessee for a less sum than that which he paid. The trustees themselves were doubtful as to the propriety of recognizing his claim for rent. It was after their promissory note had been given in payment for the combined amount, that, acting under the suggestion of counsel, they signed an antedated paper with a preamble, and form of vote containing recitals, that the purpose of the note was, "to reimburse him for his loss sustained in behalf of the Copley Square Hotel property in the sale of the furniture, and for the use of the same." The master fittingly characterized their action as a "posthumous record of an imaginary meeting." It was ineffective as an act of ratification, for the payment was unauthorized, and his disallowance of this item was right and should not be disturbed. *Rowland* v. *Maddock*, 183 Mass. 360. *Hayes* v. *Hall*, 188 Mass. 510. *Andrews* v. *Tuttle-Smith Co.* 191 Mass. 461.

But the principal sum for which the plaintiffs seek to charge the defendants is the loss arising from the foreclosure of the second mortgage. The powers of the defendants are defined by the instrument under which they were appointed. By section 5, they were given discretionary authority to mortgage the estate, either to pay in whole or in part outstanding mortgages, or to

renew them, and it is no excuse that they may have been igno-
rant of the scope of their duties or of the legal requirements con-
nected with their office. *Pierce* v. *Prescott,* 128 Mass. 140, 145–
147. The second mortgage became due either when Winkley
became trustee, or some five years later and remained overdue,
but "he made no effort to pay, renew or extend it," and "failed
to exercise the care and prudence which the law demands of a
trustee in his position." The findings which we have quoted
were amply justified by the history of his management set forth
at length in the report. Having taken no precautions to pro-
vide for a contingency which must occur if the mortgage was
not paid, renewed or extended, a foreclosure followed extin-
guishing the equity of redemption, which the master valued at
$100,000. If the foreclosure resulted from improvident manage-
ment, the master further determined that the property even then
could have been saved, if the trustees had acted promptly and
judiciously. It would not be profitable, nor is it material, to re-
count the efforts which finally were put forth, or the participation
of Albert A. Pope, who the master reports, "virtually directed
the sale." But his findings, that a loan sufficient to have paid
the mortgage could have been obtained and was offered to them
upon terms which would have saved the property and should
have been accepted, is proof of their further delinquency.

If there is no doubt that Winkley must be charged with the
full amounts previously stated, the defendant Pope urges that he
should be exonerated from all blame. It is well settled, that a
trustee is not responsible for the acts or misconduct of a co-trustee
in which he has not joined, or to which he does not consent, or
has not aided or made possible by his own neglect. *Hayes* v.
*Hall,* 188 Mass. 510, 514. Pom. Eq. Jur. (3d ed.) §§ 1081, 1082.
The defendant was required to inform himself of the various
business transactions involved in the execution of the trust. He
could not properly discharge his duty by surrendering the sub-
stantial or entire control to Winkley, or delegate his authority
to him, or to Albert A. Pope, or be indifferent, when the course
of affairs was distinctly disadvantageous to the beneficiaries whose
interests he had been selected to protect. But even if he is
given the benefit of the master's finding, that Winkley misled
and deceived him in the final attempt to preserve the property

from foreclosure, his previous findings, that with knowledge of the transaction he assented to the payment for the use of the furniture and was responsible with his co-trustee for the loss sustained through their failure to provide for the payment or extension of the second mortgage, having been amply warranted, he cannot escape liability to the shareholders. *Stowe* v. *Bowen*, 99 Mass. 194. *Hayes* v. *Hall*, 188 Mass. 510. *Cunningham* v. *Pell*, 5 Paige, 607.

We may add, that, notwithstanding the defendants' contention that the Sheldon Corporation, which is one of the parties plaintiff, should not be permitted to recover, it is not estopped upon the facts reported from sharing in the distribution of the amounts which the defendants must pay, but, Albert A. Pope having participated in their misconduct, they should not be charged with the proportion of the loss represented by his shares. *Andrews* v. *Tuttle-Smith Co.* 191 Mass. 461, 468, and cases cited.

The result is, that the interlocutory decree must be modified by overruling the defendants' second exception to the master's report, and the final decree should charge the defendants with the sum of $100,000 with interest from September 19, 1907, and the additional sum of $4,000 with interest from September 30, 1905, and when so modified the decrees severally are affirmed, and the plaintiffs are respectively entitled to recover the amounts as therein specified.

*Ordered accordingly.*